UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

RESEARCH INSTITUTE AT
NATIONWIDE CHILDREN'S
HOSPITAL,

             Plaintiff,

    v.

TRELLIS BIOSCIENCE, LLC,

             Defendant.

Case No. 2:15-cv-3032
CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Elizabeth P. Deavers

## OPINION AND ORDER

This matter is before the Court on Defendant's Motion to Dismiss or, Alternatively, to Transfer Venue [ECF Nos. 23, 27].[1] For the reasons that follow, Defendant's Motion is **DENIED**.

## I.

Plaintiff, Research Institute at Nationwide Children's Hospital ("RINCH"), is a non-profit corporation based in Columbus, Ohio. (Compl. ¶ 1 [ECF No. 1].) RINCH is a pediatric research center focused on improving children's health. (*Id.* ¶ 6.) Among other areas of study, RINCH has, for years, "researched compositions and methods for the destruction or remediation of biofilms in the clinical and industrial settings." (*Id.* ¶ 8.) As RINCH explains in its Complaint,

> Biofilm is a "slime" comprised of primarily DNA held together by DNA binding proteins such as the bacterial protein "integration host factor (IHF)." These biofilms prevent the innate and adaptive immune systems, antibiotics, and other antibacterial agents from gaining access to bacteria located within the biofilm. Bacteria within the biofilm in the mammalian body are a significant source of

---

[1] Defendant filed redacted and unredacted versions of its Motion. The redacted version [ECF No. 23] was filed publicly. The unredacted version [ECF No. 27] is sealed. The parties also filed redacted and unredacted versions of the memorandum in opposition [ECF Nos. 31, 32] and reply brief [ECF Nos. 35, 39]. The Court cites to the unredacted documents throughout this Opinion and Order.

chronic/recurrent diseases. The biofilm makes it difficult to treat and clear bacterial infections from the body.

. . . RINCH's research sought compositions and methods for breaking through the biofilm to gain access to, treat, and/or kill the bacteria residing therein. RINCH has invested substantial time and resources developing compositions and methods of gaining access to, breaking down and inhibiting biofilm formation, and for treating and/or killing the bacteria protected within biofilms, and continues to devote resources to improve upon its existing technology and to create new compositions and methods relating to the same.

(*Id.* ¶¶ 8–9.)

Defendant, Trellis Bioscience, LLC ("Trellis"), is a Delaware limited liability company operating in Menlo Park, California. (Compl. ¶ 2.) Trellis is a biotechnology startup company that "discovers and develops human antibody therapeutics as treatment for infectious disease and cancer, using a unique proprietary method." (Ellsworth Decl. ¶ 4 [ECF No. 27-3].) Trellis has twelve employees in Menlo Park and one employee who lives in Florida. (*Id.* ¶¶ 3–4.) Trellis avers that it has never employed any Ohio citizens and has never had any Ohio offices. (*Id.* ¶ 4.)

In the late summer or early fall of 2012, RINCH's Director of Technology Commercialization, Dr. Matthew McFarland, participated in a technology showcase to promote its biofilm remediation technology. (McFarland Decl. ¶ 4 [ECF No. 31-1].) Around that same time period, Dr. McFarland spoke with Wayne Embree, an Ohio businessman affiliated with an Ohio-based firm specializing in forming and funding start-up companies. (*Id.*) Embree was aware of Trellis's business interests in biotechnology and RINCH's interest in partnering with a third party to develop antibodies. (*See id.*) Consequently, Embree told Dr. McFarland about Trellis and suggested a possible partnership between Trellis and RINCH. (*Id.* ¶ 5.)

On November 16, 2012, Embree first contacted Trellis. (Ellsworth Decl., Ex. A, at PageID 235 [ECF No. 27-4].) Embree emailed his friend and Trellis board member, Jack Anthony. (*Id.*) He asked Anthony if he was still involved in the monoclonal antibody ("mAb")

2

business, and he informed Anthony that he was working with a team that had identified antibodies that play a role in biofilm production. (*Id.*) Anthony responded by connecting Embree to Dr. Larry Kauvar, a Trellis founder and Senior Vice President. (*Id.* at PageID 234.) Dr. Kauvar emailed Embree that same afternoon. (*Id.* at PageID 231–33.) He indicated that he was "definitely interested to learn more," and advised Embree that the parties should "get a 2-way CDA [confidential disclosure agreement] in place and discuss further." (*Id.* at PageID 232.) Dr. Kauvar attached to his email a one-page information sheet on Trellis. (*Id.* at 232–33.)

Several days later, on November 21, 2012, Embree emailed Dr. McFarland offering to introduce Dr. McFarland to Dr. Kauvar. (Nov. 21, 2012 Embree Email to McFarland at PageID 339 [ECF No. 31-2].) Embree explained that he had "reached out to one of [his] life sciences contacts who's running business development for a firm called Trellis Biosciences in California." (*Id.*) In his email to Dr. McFarland, Embree quoted Dr. Kauvar's description of Trellis and the portion of Dr. Kauvar's correspondence requesting that the parties "get a 2-way CDA in place." (*Id.* at PageID 339–40.)

RINCH and Trellis first communicated directly on December 5, 2012 when Embree introduced Dr. Kauvar to Dr. McFarland via email. (Ellsworth Decl., Ex. B, at PageID 238 [ECF No. 27-5].) Dr. Kauvar quickly replied to the introductory email. (*Id.*) He asked Dr. McFarland if he wanted to have a non-confidential introductory call, and he again suggested that the parties "get a 2-way CDA in place." (*Id.*) Dr. McFarland eventually responded: he agreed to an introductory call, and he was "happy to review" Trellis's CDA. (*Id.* at PageID 237.) Several days later, on December 13, Dr. Kauvar emailed Dr. McFarland a one-page information sheet on Trellis and two publications that Dr. Kauvar had written. (Dec. 13, 2012 Kauvar Email to McFarland at PageID 346 [ECF No. 31-2].)

Dr. Kauvar sent Dr. McFarland a nondisclosure agreement ("NDA") on December 8. (Dec. 8, 2012 Kauvar Email to McFarland at PageID 342 [ECF No. 31-2].) Dr. McFarland returned an unsigned copy of the NDA on December 18; he proposed changing the governing law to Ohio. (Dec. 8, 2012 McFarland Email to Kauvar at PageID 349 [ECF No. 31-2].) Dr. Kauvar accepted Dr. McFarland's edits, noting: "Ohio jurisdiction is fine. I have never had a problem and don't expect one now. The major novel IP is from your guys, so that's fine." (Dec. 8, 2012 Kauvar Email to McFarland at PageID 349 [ECF No. 31-2].) The parties executed a mutual NDA later that day. (NDA at 1 [ECF No. 1-1].)

After executing the NDA, RINCH and Trellis had numerous communications on potential avenues for collaboration; RINCH disclosed details about alleged confidential and trade secret information in several of those communications. (McFarland Decl. ¶¶ 13–30 [ECF No. 31-1].) The parties, for example, held teleconferences throughout 2013: on January 18; February 20; March 5; May 15; and October 17. (*Id.* ¶¶ 13, 15–16, 26, 29.) The parties exchanged emails and telephone calls, many of which were initiated by Trellis. (*Id.* ¶¶ 13, 17–18, 22–28.) And the parties even met in person. (*Id.* ¶ 20.) Dr. Kauvar had emailed Dr. McFarland on April 9, 2013 asking to visit RINCH's facility in Columbus, Ohio, for a "working session" with RINCH's inventors. (*Id.* ¶ 18.) Dr. McFarland agreed, and so on May 10, 2013, Dr. Kauvar came to Columbus and met with RINCH inventors at RINCH's headquarters. (*Id.* ¶ 20.) During the visit, RINCH disclosed alleged trade secret and confidential information to Dr. Kauvar. (*Id.*)

In addition to sharing alleged confidential and trade secret information under the NDA, the parties were also discussing other potential agreements. (McFarland Decl. ¶¶ 21, 29–30.) The parties, however, were unable to conclude those agreements, and they cut off their negotiations in mid-October 2013. (*Id.* ¶ 29.)

4

In September 2013, and unbeknownst to RINCH, Trellis began filing patent applications relating to biofilm remediation. (Compl. ¶ 27; Mem. in Opp'n at 5 [ECF No. 31].) RINCH eventually learned of these patent applications and, on November 24, 2015, sued Trellis for breach of contract and violation of Ohio's Uniform Trade Secrets Act. (Compl. at 11–15.) Trellis's patent applications allegedly violate the NDA and the Uniform Trade Secrets Act through their use and disclosure of RINCH's confidential and trade secret information. (*Id.* ¶¶ 36–58.)

Trellis now moves to dismiss for lack of personal jurisdiction. (Mot. to Dismiss at 1 [ECF No. 27].) As an alternative to dismissal, Trellis requests that the Court transfer the case to the Northern District of California. (*Id.*)

## II.

Federal Rule of Civil Procedure 12(b)(2) provides for dismissal when a court lacks personal jurisdiction over a defendant. In considering a motion to dismiss for lack of personal jurisdiction, district courts have discretion to either decide the motion on the pleadings alone, permit discovery in aid of deciding the motion, or conduct an evidentiary hearing to resolve any apparent factual questions. *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991) (citing *Serras v. First Tenn. Bank Nat'l Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989)). Here, the record is sufficiently developed that the Court can decide Trellis's Motion to Dismiss without a hearing.

Plaintiff bears the burden of establishing personal jurisdiction. *Estate of Thomson v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 360 (6th Cir. 2008) (citing *Brunner v. Hampson*, 441 F.3d 457, 462 (6th Cir. 2006)). Where a Rule 12(b)(2) motion is decided solely on written submissions, the plaintiff's burden is "relatively slight"; the court must view all of the pleadings

and affidavits in a light most favorable to the plaintiff, and to defeat dismissal, the plaintiff need only make a prima facie showing that personal jurisdiction exists. *Am. Greetings Corp. v. Cohn*, 839 F.2d 1164, 1169 (6th Cir. 1988); *Shaker Constr. Grp. LLC, v. Schilling*, No. 1:08-cv-278, 2008 WL 4346777, at *1 (S.D. Ohio Sept. 18, 2008). Indeed, as the Sixth Circuit has explained, a court disposing of a 12(b)(2) motion "does not weigh the controverting assertions of the party seeking dismissal." *Theunissen*, 935 F.2d at 1459. The Sixth Circuit has adopted that approach "to prevent non-resident defendants from regularly avoiding personal jurisdiction simply by filing an affidavit denying all jurisdictional facts." *Id.*

Federal courts apply the law of the forum state when deciding whether personal jurisdiction exists over a defendant. *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996). Thus, to find that it has personal jurisdiction over Trellis, the Court must determine that Trellis is amenable to suit under Ohio's long-arm statute, O.R.C. § 2307.382, and that the Court's jurisdictional exercise comports with the due process requirements of the United States Constitution. *CompuServe, Inc.*, 89 F.3d at 1262. Here, the Court finds that both requirements are satisfied.

### III.

#### A. Ohio's Long-Arm Statute

Ohio's long-arm statute allows Ohio courts to exercise personal jurisdiction over out-of-state defendants on claims arising from nine specific situations. O.R.C. § 2307.382(A). As relevant here, the Court may exercise personal jurisdiction over Trellis if this case arises out of Trellis "[t]ransacting any business in [Ohio]," *id.* § 2307.382(A)(1), or "[c]ausing tortious injury in [Ohio] . . . by an act outside th[e] state committed with the purpose of injuring persons, when [it] might reasonably have expected that some person would be injured thereby in th[e] state," *id.*

§ 2307.382(A)(6).[2]

### 1.    Transacting Business in Ohio under Section (A)(1)

Under O.R.C. § 2307.382(A)(1), "a court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's . . . [t]ransacting any business in [Ohio]." Trellis argues that its activities in Ohio are insufficient to fall within Section (A)(1)'s coverage. (Mot. to Dismiss at 7–9 [ECF No. 27].) Trellis has allegedly not transacted business in Ohio because "Trellis merely responded to an inquiry made by RINCH, entered into an NDA remotely from its offices in California, and engaged in (at most) two discussions involving the exchange of allegedly misappropriated confidential information." (Reply in Supp. of Mot. to Dismiss at 7 [ECF No. 39].) Trellis also contends that RINCH's claims do not arise out of Trellis's actions because the actions that RINCH complains of—Trellis's research and patent disclosures—occurred in California. (Mot. to Dismiss at 8.) RINCH sees the evidence differently. According to RINCH, Trellis transacted business in Ohio given that it negotiated and executed the NDA, attempted to negotiate other agreements, obtained and discussed alleged confidential and trade secret information, and visited Ohio for a working session. (Mem. in Opp'n at 8–12 [ECF No. 31].) RINCH also notes that Trellis agreed that the NDA should be governed by Ohio law. (*Id.* at 9.)

As the Ohio Supreme Court has explained, the term "transact," from the phrase "[t]ransacting any business," means "'to prosecute negotiations; to carry on business; to have dealings'" *Ky. Oaks Mall Co. v. Mitchell's Formal Wear, Inc.*, 559 N.E.2d 477, 480 (Ohio 1990)

---

[2] RINCH also contends that the Court has personal jurisdiction over Trellis under O.R.C. § 2307.382(A)(4). (Mem. in Opp'n at 14–15 [ECF No. 31].) The Court need not analyze Trellis's actions under that section, though, given that Trellis's actions fall within the scope of Sections (A)(1) and (A)(6) of Ohio's long-arm statute. And given that the Court determines that it has personal jurisdiction over Trellis, the Court also need not address RINCH's argument that Trellis waived personal jurisdiction when its attorney allegedly filed a general appearance in this case. (Mem. in Opp'n at 7.)

(emphasis deleted) (quoting *Black's Law Dictionary* 1341 (5th ed. 1979)); *see also Goldstein v. Christiansen*, 638 N.E.2d 541, 544 (Ohio 1994). "Transact" is a "'broader term than the word "contract" and may involve business negotiations which have been either wholly or partly brought to a conclusion.'" *Burnshire Dev., LLC v. Cliffs Reduced Iron Corp.*, 198 F. App'x 425, 431 (6th Cir. 2006) (quoting *Ky. Oaks Mall Co.*, 559 N.E.2d at 480). A nonresident must do more than simply solicit business in Ohio, though; "a nonresident's ties must 'create a "substantial connection" with the [state].'" *U.S. Sprint Commc'ns Co. Ltd. P'ship v. Mr. K's Foods, Inc.*, 624 N.E.2d 1048, 1052 (Ohio 1994) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

This Court has considered two factors to "help determine whether an out-of-state defendant, in a contractual dispute, 'transacted business' within the meaning of the Ohio [l]ong-[a]rm [s]tatute." *Paglioni & Assocs. v. Winnercomm, Inc.*, No. 2:06-cv-276, 2007 WL 852055, at *9 (S.D. Ohio Mar. 16, 2007) First, the Court considers "whether the out-of-state defendant initiated the business dealing. If the defendant reached out to the plaintiff in the forum state to create a business relationship, the defendant transacted business in the forum state." *Paglioni*, 2007 WL 852055, at *9 (internal citations omitted). And second, the Court considers "whether the parties conducted their negotiations or discussions in the forum state or with terms affecting the forum state. If the parties negotiated in the forum state with provisions affecting the forum state, the defendant transacted business in the forum state." *Id.* (internal citations omitted).

Here, RINCH has made a prima facie showing that Trellis transacted business in Ohio. As to the first *Paglioni* factor, Trellis initiated the business relationship between itself and RINCH. *See Paglioni*, 2007 WL 852055, at *9. Granted, Wayne Embree, a third-party businessman, introduced Trellis and RINCH. But Trellis initiated contact with RINCH after the

two entities had been introduced. Thus, when Embree approached Trellis's Dr. Kauvar in November 2012 about RINCH, Dr. Kauvar responded by sending Embree an information sheet on Trellis and proposing that the parties should "get a 2-way CDA in place." (Ellsworth Decl., Ex. A, at PageID 231–33 [ECF No. 27-4].)  Then, after Embree introduced the parties via email, Dr. Kauvar quickly reached out to RINCH's Dr. McFarland. (*Id.*, Ex. B, at PageID 238 [ECF No. 27-5].) Dr. Kauvar asked Dr. McFarland if he wanted to have an introductory call and again suggested that the parties "get a 2-way CDA in place." (*Id.*) Dr. Kauvar sent an NDA to Dr. McFarland. (Dec. 8, 2012 Kauvar Email to McFarland at PageID 349 [ECF No. 31-2].) And in negotiating the NDA, Dr. Kauvar informed Dr. McFarland that "Ohio jurisdiction is fine." (*Id.*)[3]

Trellis contends that RINCH initiated the parties' business relationship. Trellis points to the Complaint. (Reply in Supp. of Mot. to Dismiss at 8 [ECF No. 39].) In its Complaint, RINCH states that it "contacted Trellis" around December of 2012. (Compl. ¶ 16 [ECF No. 1].) Trellis, however, conflates "contact" and "initiate." *See* Merriam-Webster, http://www.merriam-webster.com/dictionary/contact & http://www.merriam-webster.com/dictionary/initiate (last visited Sept. 2, 2016) (defining "contact" as "an occurrence in which people communicate with each other") (defining "initiate" as "to cause the beginning of (something) : to start or begin (something)"). RINCH's allegation that it "contacted Trellis" is far from an admission that it initiated the parties' business relationship. Trellis also argues that Embree reached out to Trellis on RINCH's behalf. (Reply in Supp. of Mot. to Dismiss at 8–9.) The evidence does not support this conclusion, though. Rather, Embree's initial email to Trellis, read in conjunction with Embree's initial email to RINCH, suggests that Embree contacted Trellis on his own initiative.

_____

[3] As Trellis correctly observes, the existence of a choice-of-law provision in a contract, standing alone, is insufficient to establish personal jurisdiction. *Intera Corp. v. Henderson*, 428 F.3d 605, 618 (6th Cir. 2005). Such a provision, however, "may 'reinforce [a] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there.'" *Id.* (quoting *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 723 (6th Cir. 2000)).

(*See* Ellsworth Decl., Ex. A, at PageID 235; Nov. 21, 2012 Embree Email to McFarland at PageID 339 [ECF No. 31-2].)

As to the second *Paglioni* factor, the parties negotiated the NDA electronically. (Dec. 8, 2012 McFarland Email to Kauvar at PageID 349 [ECF No. 31-2]; Dec. 8, 2012 Kauvar Email to McFarland at PageID 349 [ECF No. 31-2].) Dr. Kauvar's communications were directed to Ohio, though. (*See* Dec. 8, 2012 Kauvar Email to McFarland at PageID 349.)  And Dr. McFarland received these communications in Ohio. (*See id.*) Trellis insists that Dr. Kauvar's communications with Dr. McFarland were not "business negotiations." (Reply in Supp. of Mot. to Dismiss at 9.) But Trellis interprets "negotiations" too narrowly. A negotiation is "a formal discussion between people who are trying to reach an agreement." Merriam-Webster, http://www.merriam-webster.com/dictionary/negotiations (last visited Sept. 2, 2016) (defining "negotiation"). And here, Drs. Kauvar and McFarland engaged in formal email discussions to reach an agreement on the NDA that Dr. Kauvar had proposed. (*See* Dec. 8, 2012 Kauvar Email to McFarland at PageID 342; Dec. 8, 2012 McFarland Email to Kauvar at PageID 349 [ECF No. 31-2]; Dec. 8, 2012 Kauvar Email to McFarland at PageID 349.)

The second *Paglioni* factor is also satisfied here given that the NDA's terms affect Ohio. The NDA protects confidential information owned by RINCH, an Ohio non-profit, and a breach of the NDA would impair RINCH's confidential information.

Through its activities in Ohio, Trellis has established a substantial connection to the state. Trellis negotiated the NDA through communications directed to Ohio; executed an NDA with Ohio-based RINCH in which Trellis agreed not to disclose or use RINCH's confidential information for any purpose other than those defined in the NDA; obtained confidential information from RINCH in numerous phone calls and teleconferences which occurred, in part,

10

in Ohio (or were directed to Ohio); obtained confidential information from RINCH during an in-person meeting at RINCH's laboratories in Ohio; and attempted to negotiate additional agreements relating to the confidential information. (*See* McFarland Decl. ¶¶ 5–30 [ECF No. 31-1].)

Trellis contends that its discussions with RINCH regarding additional agreements "do not form the operative facts of the dispute regarding breach of the NDA and misappropriation of confidential information." (Reply in Supp. of Mot. to Dismiss at 12.) That may be true. But all of the other transactions described above—Trellis negotiating the NDA, executing the NDA, and obtaining confidential information under the NDA—do, undisputedly, give rise to RINCH's claims. (*See id.* at 2–3.) RINCH sued Trellis for breach of contract and for violation of Ohio's Uniform Trade Secrets Act because Trellis allegedly used RINCH's confidential information for purposes other than those permitted under the NDA. (Compl. at 11–15 [ECF No. 1].)

Next, Trellis cites *Verulux, LTC. v. Johnston* in support of its argument that it has not transacted business in Ohio. No. 3:09 CV 823, 2010 WL 1795888, at *4–5 (N.D. Ohio May 5, 2010). *Verulux* is inapposite. In that case, the NDAs at issue "were prepared by Canadian lawyers and executed in Canada. The only relationship asserted between the declaratory judgment claim and Ohio is that Johnston's [the defendant's] counsel initiated telephone calls warning [the plaintiffs] and their attorney to comply with the NDAs, and these calls were received in Ohio." *Id.* at *4. Here, by contrast, Trellis negotiated the NDA electronically, through communications directed to Ohio. (*See* Dec. 8, 2012 Kauvar Email to McFarland at PageID 349; *cf. Russian Collections, Ltd. v. Melamid*, No. 2:09-cv-300, 2009 WL 4016493, at *5 (S.D. Ohio Nov. 18, 2009) ("When 'a nonresident defendant transacts business by negotiating and executing a contract via telephone calls and letters to an Ohio resident, then the defendant has purposefully

availed himself of the forum . . . .'") (quoting *Cole v. Mileti*, 133 F.3d 433, 436 (6th Cir. 1998)).)

And RINCH's claims arise out of those negotiations, the parties' subsequent phone calls and

teleconferences (which occurred, in part, in Ohio), an in-person meeting (which Trellis's Dr.

Kauvar attended at RINCH's laboratories in Ohio), and Trellis's alleged misappropriation of

RINCH's trade secrets and confidential information. (*See* Compl. ¶¶ 36–58; McFarland Decl. ¶¶

5–30; *cf. Russian Collections*, 2009 WL 4016493, at *5 ("'[T]he breach of [a] contract entered

into with an Ohio resident is the event which does the damages within Ohio and satisfies [the]

requirement [that the cause of action arise out of a defendant's actions in the state.]'") (quoting

*Wright Int'l Express Inc. v. Roger Dean Chevrolet, Inc.*, 689 F. Supp. 788, 790 (S.D. Ohio

1988)).)

Trellis also cites *North American Software, Inc. v. James I. Black & Co.*, 1st Dist.

Hamilton No. C-100696, 2011-Ohio-3376, ¶¶ 13–16. But *North American* does not advance

Trellis's cause either. In *North American*, the plaintiff solicited the initial contract, "provided no

evidence that [the defendant] actively negotiated the terms of any agreement between the

parties," and pointed to communications with the defendant whose relationship to the

controversy in the case was "unclear." *Id.* ¶ 16. In the present case, Trellis solicited RINCH's

consideration of the NDA, sent the NDA to RINCH, negotiated the NDA electronically, and

engaged in communications with RINCH that clearly form the basis of RINCH's breach of

contract and trade secrets claims. (*See* McFarland Decl. ¶¶ 5–30.)

Trellis, in sum, transacted business in Ohio within the meaning of O.R.C. §

2307.382(A)(1). Although this conclusion, alone, is sufficient to establish the Court's personal

jurisdiction over Trellis under Ohio's long-arm statute, the Court will also consider Section (A)6

of that statute.

### 2.  Causing Tortious Injury in Ohio under Section (A)(6)

Under Section (A)(6) of the Ohio long-arm statute, a court may exercise personal jurisdiction over a nonresident defendant "as to a cause of action arising from the [defendant's] . . . [c]ausing tortious injury in this state to any person by any act outside this state committed with the purpose of injuring persons, when he might reasonably have expected that some person would be injured thereby in this state." O.R.C. § 2307.382(A)(6); *Clark v. Connor*, 695 N.E.2d 751, 755–56 (Ohio 1998).

Trellis argues that Section (A)(6) can only serve as a basis of personal jurisdiction when a plaintiff "alleges *intentional* tortious conduct, such as conversion, conspiracy, or defamation." (Reply in Supp. of Mot. to Dismiss at 14 [ECF No. 39].) And according to Trellis, neither of RINCH's causes of action require, or involve, any allegations of Trellis's intent. (*Id.* at 14–15.)

Trellis interprets Section (A)(6) too narrowly. As the Northern District of Ohio has explained, the "provision has been interpreted broadly." *Pay(q)r, LLC v. Sibble*, No. 5:15-cv-1038, 2015 WL 9583034, at *5 (N.D. Ohio Dec. 31, 2015). District courts in Ohio, and even the Supreme Court of Ohio, have found that the types of claims asserted by RINCH can fall within the ambit of § 2307.382(A)(6). *Id.* (misappropriation of trade secrets); *Safety Today, Inc. v. Roy*, No. 2:12-cv-510, 2012 WL 2374984, at *2 (S.D. Ohio June 22, 2012) (misappropriation of trade secrets); *Clark*, 695 N.E.2d at 753, 755–56 (misappropriation of trade secrets in violation of nondisclosure agreements and Ohio's Uniform Trade Secrets Act).

Viewed in the light most favorable to RINCH, the Complaint and affidavits amount to a prima facie showing that Trellis caused a tortious injury in Ohio by an act committed with the purpose of injuring persons and that Trellis might reasonably have expected that some person would be injured in Ohio by that act. *See* O.R.C. § 2307.382(A)(6). RINCH has alleged or

provided evidence that (i) Trellis knew that the technology being shared by RINCH was RINCH's confidential, intellectual property, (*see* Dec. 8, 2012 Kauvar Email to McFarland at PageID 349 [ECF No. 31-2]), (ii) Trellis knew the potential value of RINCH's confidential information, (*see* Ellsworth Decl., Ex. B, at PageID 238 [ECF No. 27-5]), (iii) Trellis understood that its breach of the NDA and misappropriation of RINCH's confidential information could harm RINCH—an entity with a principal place of business in Ohio, (NDA at 3–4 [ECF No. 1-1]), and (iv) Trellis misappropriated RINCH's confidential information and breached the NDA with the purpose of injuring RINCH, (*see* Compl. ¶ 55 [ECF No. 1].)

The Court has personal jurisdiction over Trellis under Section (A)(6) of Ohio's long-arm statute. *See* O.R.C. § 2307.382(A)(6).

**B.     Due Process**

Given that the Court can exercise personal jurisdiction over Trellis under Ohio's long-arm statute, the Court must now determine whether exercising personal jurisdiction over Trellis comports with constitutional due process requirements. Courts in the Sixth Circuit make this determination using the three-part test set forth in *Southern Machine Company v. Mohasco Industries, Inc.*, 401 F.2d 374, 381 (6th Cir. 1968). *See Nationwide Mut. Ins. Co. v. Tryg Int'l Ins. Co.*, 91 F.3d 790, 793 (6th Cir. 1996). "First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state." *S. Mach. Co.*, 401 F.2d at 381. "Second, the cause of action must arise from the defendant's activities there." *Id.* And third, "the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *Id.*

### 1.    Purposeful Availment

The purposeful availment requirement provides some degree of predictability to out-of-state residents so that they can structure their conduct with some assurance as to where their conduct will and will not render them liable to suit. *Worldwide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). This requirement protects out-of-state residents from being haled into a jurisdiction based only upon "'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.'" *Burger King*, 471 U.S. at 475 (internal citations omitted) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984); *Worldwide Volkswagen Corp.*, 44 U.S. at 299). Accordingly, "where the defendant 'deliberately' has engaged in significant activities within a State, or has created 'continuing obligations' between [itself] and residents of the forum, [it] manifestly has availed [itself] of the privilege of conducting business there." *Id.* at 475–76 (internal citations omitted) (quoting *Keeton*, 465 U.S. at 781; *Travelers Health Ass'n v. Virginia (ex rel State Corp. Comm'n)*, 339 U.S. 643, 648 (1950)). The Ohio long-arm statute's "'transacting any business' standard is coextensive with the purposeful availment prong of constitutional analysis." *Burnshire Dev.*, 198 F. App'x at 432.

Given that Trellis has transacted business within the meaning of the Ohio long-arm statute, Trellis has also purposefully availed itself of the privilege of acting in Ohio. *See id.* Trellis directed introductory material to RINCH, suggested that the parties "get a 2-way CDA in place," sent a proposed NDA to RINCH, agreed to changing the NDA's governing law to Ohio, sent an executed version of the NDA to RINCH, initiated numerous email and telephone conversations with RINCH, and solicited confidential information from RINCH. (Ellsworth Decl., Ex. B, at PageID 238 [ECF No. 27-5]; Dec. 13, 2012 Kauvar Email to McFarland at

PageID 346 [ECF No. 31-2]; Dec. 8, 2012 Kauvar Email to McFarland at PageID 342 [ECF No. 31-2]; Dec. 8, 2012 Kauvar Email to McFarland at PageID 349 [ECF No. 31-2]; NDA at 1 [ECF No. 1-1]; McFarland Decl. ¶¶ 5–30 [ECF No. 31-1].) Trellis communicated with RINCH under the NDA for nearly a year. (*See* McFarland Decl. ¶¶ 11–30.) In addition, Trellis's Dr. Kauvar suggested, and then followed through on, travel plans to RINCH's laboratories in Ohio. (*Id.* ¶¶ 18, 20.) While in Ohio, Dr. Kauvar met with RINCH inventors and obtained alleged trade secret and confidential information from them. (*Id.*)

Trellis analogizes the present case to *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 722 (6th Cir. 2000), a case in which the Sixth Circuit found that "the mere existence of a contract between [the defendant] and an Ohio citizen for seventeen months [was] insufficient" to establish purposeful availment. The analogy is misguided though. Defendant Rowlette, a Minnesota corporation, had entered into a manufacturer's representative agreement with Calphalon. *Id.* at 720. Rowlette corresponded with Calphalon in Ohio by telephone, fax, and mail. *Id.* And Rowlette's president visited Ohio twice. *Id.* These contacts were, according to the *Calphalon* court, too random, fortuitous, and attenuated to support personal jurisdiction over Rowlette. *Id.* at 723. Rowlette's contacts with Ohio were "solely because Calphalon chose to be headquartered [there]." *Id.* Here, by contrast, Trellis's contacts with Ohio were not solely because RINCH chose to be headquartered in the state; Trellis affirmatively reached out to RINCH to negotiate the NDA in an effort to share information and develop a continuing relationship. (*See* Ellsworth Decl., Ex. B, at PageID 238 [ECF No. 27-5]; *cf. Tharo Sys., Inc. v. Cab Produkttechnik GMBH & Co. KG*, 196 F. App'x 366, 370–71 (6th Cir. 2006) (distinguishing *Calphalon* on the basis that the defendant in *Tharo* "affirmatively reached out to [the plaintiff] to negotiate [a Letter of Understanding] in an effort to strengthen the parties'

mutual business relationship").).

Trellis's contacts with RINCH in Ohio were, in sum, not random, fortuitous, or attenuated. Nor were its contacts the result of RINCH's unilateral activity. Trellis's contacts were deliberate, and they involved a continuing obligation to a resident of the forum—the obligation to adhere to the NDA that Trellis entered into with RINCH, an Ohio non-profit corporation. Trellis purposefully availed itself of the privilege of acting in Ohio.

### 2. Connection to the Causes of Action

Under the second *Southern Machine* requirement, a plaintiff's "cause of action must arise from the defendant's activities there." 401 F.2d at 381. However, as the Sixth Circuit explained in *Southern Machine*, "the second criterion does not require that the cause of action formally 'arise from' defendant's contacts with the forum; rather, this criterion requires only 'that the cause of action, of whatever type, *have a substantial connection with* the defendant's in-state activities.'" *Third Nat'l Bank v. WEDGE Grp., Inc.*, 882 F.2d 1087, 1091 (6th Cir. 1989) (quoting *S. Mach. Co.*, 401 F.2d at 384 n.27). "Only when the operative facts of the controversy are not related to the defendant's contact with the state can it be said that the cause of action does not arise from that [contact]." *S. Mach. Co.*, 401 F.2d at 384 n.29. As the Sixth Circuit has also explained "'physical presence is not the touchstone of personal jurisdiction,' and hence, personal jurisdiction may exist over a defendant although he is not physically present in the forum if he 'purposefully directs communications into the forum [. . .] and those communications form the "heart" of the cause of action.'" *Intera Corp. v. Henderson*, 428 F.3d 605, 617–18 (6th Cir. 2005) (quoting *Neal v. Janssen*, 270 F.3d 328, 333 (6th Cir. 2001)).

Here, the causes of action against Trellis are sufficiently connected to its in-state activities. As the Court previously noted, RINCH's claims arise out of the NDA negotiations

(which occurred electronically and were directed to Ohio), the parties' subsequent phone calls and teleconferences (which occurred, in part, in Ohio, or were directed to Ohio), an in-person meeting (which Trellis's Dr. Kauvar attended at RINCH's laboratories in Ohio), and Trellis's alleged misappropriation of RINCH's trade secrets and confidential information. (*See* Compl. ¶¶ 36–58 [ECF No. 1]; McFarland Decl. ¶¶ 5–30 [ECF No. 31-1]; *see also* Reply in Supp. of Mot. to Dismiss at 12 [ECF No. 39].) The second *Southern Machine* requirement is satisfied.

### 3. Reasonableness

A defendant's actions, or the consequences caused by a defendant's actions, "must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *S. Mach. Co.*, 401 F.2d at 381. This final criterion of the *Southern Machine* test "looks to the extent of the forum state's interest and whether exertion of jurisdiction over the particular defendant is fair." *First Nat'l Bank v. J.W. Brewer Tire Co.*, 680 F.2d 1123, 1126 (6th Cir. 1982). "When the first two elements [of the *Southern Machine* test] are met, an inference arises that the third, fairness, is also present; only the unusual case will not meet this third criterion." *Id.* When considering whether it is reasonable to exercise personal jurisdiction over a non-resident defendant, courts typically consider "(1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most efficient resolution of the controversy." *Intera Corp.*, 428 F.3d at 618.

This is not the unusual case. Given the extent of Trellis's connections with Ohio, the Court's exercise of personal jurisdiction over Trellis is reasonable. Trellis executed an NDA with RINCH through communications directed to Ohio, regularly communicated with RINCH under the NDA, obtained alleged confidential and trade secret information from RINCH under the

NDA, and obtained additional alleged confidential and trade secret information during a visit to RINCH's laboratories in Columbus, Ohio. (*See* McFarland Decl. ¶¶ 5–30.)

The four factors outlined above also demonstrate the reasonableness of exercising personal jurisdiction over Trellis. Trellis, a Delaware corporation operating in California, would be burdened by defending a lawsuit in Ohio. The Sixth Circuit, however, has "deemed specific jurisdiction to be proper even when a defendant would be compelled to travel." *Intera Corp.*, 428 F.3d at 618. Ohio has a strong interest in safeguarding RINCH's legal options and enforcing an NDA whose alleged breach harmed an Ohio non-profit corporation. *See id.* RINCH has a substantial interest in obtaining relief for the alleged breach of the NDA and purported misappropriation of its trade secrets. And, although California or Delaware might have an interest in securing an efficient resolution of this controversy, Ohio's interest is equally strong or stronger given the parties' connection to the state.

Exercising personal jurisdiction over Trellis comports with constitutional due process requirements. Accordingly, the Court must consider Trellis's alternative argument—a transfer of venue.

## C.     Alternative Motion to Transfer Venue

Trellis contends that this case should be transferred to the Northern District of California. "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). When interpreting § 1404(a), courts "must engage in a two-step analysis and determine: (1) whether the action might have been brought in the proposed transferee court; and (2) whether considering all relevant factors, the balance of convenience and the interest of justice 'strongly' favor

transfer." *Proctor & Gamble Co. v. Team Techs., Inc.*, No. 1:12-cv-552, 2012 WL 5903126, at

*3 (S.D. Ohio Nov. 26, 2012) (quoting *Kay v. Nat'l City Mortg. Co.*, 494 F. Supp. 2d 845, 850

(S.D. Ohio 2007)). The proposed forum must be "a more convenient forum, not [simply] a forum

likely to prove equally convenient or inconvenient." *Van Dusen v. Barrack*, 376 U.S. 612, 645–

46 (1964). "The moving party has the burden of establishing the need for a transfer of venue."

*Jamhour v. Scottsdale Ins. Co.*, 211 F. Supp. 2d 941, 945 (S.D. Ohio 2002).

To begin, the Court finds that RINCH could have brought this case in the Northern

District of California (where Trellis's sole office and principal place of business is located).

(Mot. to Dismiss at 13 [ECF No. 27].) The Court thus moves to the second step of the § 1404(a)

analysis. When considering that step, courts consider the private interests of the parties and the

public's interest in the administration of justice. *Dayton Superior Corp. v. Yan*, 288 F.R.D. 151,

165 (S.D. Ohio 2012). Private interests include "'[t]he relative ease of access to sources of proof;

availability of compulsory process for attendance of unwilling, and the cost of obtaining

attendance of willing witnesses; . . . and all other practical problems that make trial of the case

easy, [expeditious] and inexpensive.'" *Id.* (citing *Jamhour*, 211 F. Supp. 2d at 945). Relevant

public interest factors include "'[d]ocket congestion, the burden of trial to a jurisdiction with no

relation to the cause of action, the value of holding trial in a community where the public

affected live, and the familiarity of the court with controlling law.'" *Id*. (*Jamhour*, 211 F. Supp.

2d at 945).

### 1.    **Private Interests**

Trellis contends that the private interests favor the Northern District of California. Trellis

notes that it may call as many as seven current employees and at least four non-party witnesses,

all of whom are located in or near the Northern District of California. (Mot. to Dismiss at 14.)

Trellis also argues that the bulk of the evidence in this case revolves around its research efforts on the biofilm project and that this evidence is located in the Northern District of California. (*Id.* at 15.)

RINCH, by contrast, asserts that most of its potential witnesses reside in Ohio, including "[a] the inventors of the misappropriated technology[;] . . . [b] Trellis'[s] contact at RINCH for negotiating the NDA [and other potential agreements]; and [c] [several] researchers." (Mem. in Opp'n at 18 [ECF No. 31].) Various former RINCH employees may also testify; those employees reside in Ohio, Florida, and Illinois. (*Id.* at 18–19.) And with respect to evidence, RINCH notes that "[w]hile Trellis'[s] acts of misappropriation occurring in California are relevant to RINCH's claims," equally relevant to the case is "RINCH's conception and development of its confidential and proprietary information and intellectual property, its communication of that information to Trellis, and the harm to RINCH from Tellis'[s] breach of the parties' NDA and misappropriation of RINCH's trade secrets, all of which occurred in Ohio." (*Id.* at 19.)

The private interests in this case do not strongly favor transfer. As an initial matter, a plaintiff's choice of forum "is given considerable weight." *Jamhour*, 211 F. Supp. 2d at 946. And here, RINCH chose the Southern District of Ohio. With respect to witness convenience, the Northern District of California is a more convenient forum for Trellis's witnesses whereas the Southern District of Ohio is a more convenient forum for RINCH's witnesses. Courts normally give considerable weight to the convenience of witnesses. *See Picker Int'l, Inc. v. Travelers Indem. Co.*, 35 F. Supp. 2d 570, 573 (N.D. Ohio 1998). Section 1404(a), however, "'does not allow for transfer to a forum that is equally convenient or inconvenient'" or for a transfer that "'would only shift the inconvenience from one party to another.'" *Odom Indus., Inc. v.*

21

*Diversified Metal Prods., Inc.*, No. 1:12-cv-309, 2012 WL 4364299, at *17 (S.D. Ohio Sept. 24, 2012) (quoting *Brown v. Miami Mgmt. Co.*, No. 1:05-cv-535, 2006 WL 1582448, at *2 (S.D. Ohio June 8, 2006)). The location of evidence does not weigh in favor of transfer either. A considerable amount of the evidence in this case is located in Ohio. And although a potentially equal amount of evidence is located in California, much of that evidence could be easily sent by mail or email to the Southern District of Ohio. *See Picker Int'l, Inc.*, 35 F. Supp. 2d at 574 ("[T]he location of documentary evidence is a minor consideration. Documents may easily be sent by mail, copied or even faxed to a remote location.").

### 2.    Public Interest

According to Trellis, the public interest factors also weigh in favor of transfer. The Southern District of Ohio, Trellis notes, has a median time elapsed from filing to final disposition of cases of 9.1 months whereas the Northern District of California's median time elapsed is 7.8 months. (Mot. to Dismiss at 16 [ECF No. 27].) Trellis also contends (i) that a jury pool in California would feel as connected to this litigation at least as strongly as a jury pool in Ohio, (ii) that there is at least an equal local interest in having this dispute decided in California as there is in Ohio, and (iii) that the Northern District of California is just as capable of applying Ohio law as the Southern District of Ohio. (*Id.* at 17.)

RINCH acknowledges the longer median case length for the Southern District of Ohio. (Mem. in Opp'n at 20.) And RINCH also acknowledges that the public interest factors outlined by Trellis may favor California as much as they favor Ohio. (*Id.*) As RINCH observes though, these arguments fail to meet Trellis's burden of establishing that the balance of convenience and the interest of justice strongly favor transfer. (*See id.*)

The Court agrees with RINCH's analysis. The difference between the districts in median

case length from filing to final disposition is slight. Accordingly, that factor does not weigh in favor of transfer. The other public interest factors do not weigh in favor of transfer either. Trellis's arguments establish, at best, that the Northern District of California is an equal forum choice to the Southern District of Ohio with respect to public interest factors. But to succeed on its motion, Trellis must establish that "the balance of convenience and the interest of justice 'strongly' favor transfer." *Proctor & Gamble Co.*, 2012 WL 5903126, at *3 (quoting *Kay*, 494 F. Supp. 2d at 850). And Trellis's proposed forum must be "a more convenient forum, not [simply] a forum likely to prove equally convenient or inconvenient." *Van Dusen*, 376 U.S. at 645–46. Trellis has not met this burden with respect to the public interest factors. Nor has Trellis met this burden with respect to the private interests. The Court, therefore, declines to transfer this case to the Northern District of California.

## IV.

For the reasons stated above, Trellis's Motion to Dismiss or, Alternatively, to Transfer Venue [ECF Nos. 23, 27] is **DENIED**.

**IT IS SO ORDERED.**

9-30-2016
**DATE**

EDMUND A. SARGUS, JR.
**CHIEF UNITED STATES DISTRICT JUDGE**